We're going to let the courtroom clear a little bit first. Okay, Mr. Arora-Laju Good morning, good morning. May it please the court, my name is Damilola Arora-Laju, counsel for Appellant Lynn Hamlet. Due to the summary judgment posture of this case and the litany of disputed facts, we'd first like to ground this court on a set of facts that a reasonable juror can conclude. On April 27, 2018, Mr. Hamlet, a 65-year-old man with diabetes, mobility impairments, and open wounds on his ankles, sat down and showered in a handicapped shower, and he noticed water flooding to his ankles that contained urine and feces. Mr. Hamlet immediately called to be let out of the shower, but in response, Officer Hoxie pushed him back in the shower and blamed him for the conditions, and then ransacked his cell of linens, and locked Mr. Hamlet in that shower for 40 minutes. Officer Hoxie also further deprived Mr. Hamlet of showering for at least another five days. As a result, Mr. Hamlet developed a bacterial infection that destroyed his heart valve, requiring heart valve surgery to save his life. We're here to respectfully ask this court to reverse the district court's granting of summary judgment because Mr. Hamlet's conditions of confinement do not comport with the Eighth Amendment's contemporary standards of decency. We're also asking this court to provide Mr. Hamlet leave to reamend his First and Fourteenth Amendment claims while providing him counsel below to do so. We'd like to first start with the Eighth Amendment, our Eighth Amendment argument. I understand it. So your client saw this bag, right, that contained feces and immediately then moved to a part of the shower where he would not have contact. Is that right? Your Honor, yes, he tried to move to a part of a shower where he couldn't have contact, but he stated clearly that he was unable to avoid contact with the feces, and in fact that it became crusted up upon his ankles. Is the allegation, I guess there's the mention of the bag, is the allegation that the feces were in the bag and then the bag became overturned? Your Honor, yes, it's unclear exactly how the feces from the record, how it came out of the bag, but it is absolutely clear looking at ECF 112, Exhibit 1, that he states in his deposition that the feces were out of the bag and were on his ankles, and this is something that a reasonable juror could conclude. My understanding was he was exposed, he moved to a part of the shower where he would not be exposed, and then asked the officer to let him out, and whatever delay happened then was not something that caused prolonged exposure. He had already removed himself from that situation. Am I not right about that? Your Honor, we do not believe you're correct on the facts, because in his deposition he stated that, for one, that he tried to move into a part of the shower where it was a small shower, it was a very small shower. He tried to move into a higher part of the shower, but he was unable to. Particularly looking at the facts here, Officer Hoxie pushed him back in the shower, and so he was in contact with the flooded waters, but moreover, the most important part here is that the exposure to feces wasn't just in his time in the shower, that exposure continued until he was able to remove the bacteria from his open wounds, and that didn't happen for at least another five days. You said a minute ago that the feces were crusted on his ankles, but I didn't see any evidence. He testified that the feces made contact with his ankles, and if they're open wounds, I see, of course, how bacteria could get in there, but is there any evidence that it was visible on his ankles, that Officer Hoxie saw that or knew that? Your Honor, that the feces was visible on his ankles? Yes. Your Honor, from his testimony itself, looking at the posture of this... Whose testimony? Mr. Hamlet's testimony, in his deposition, he states himself that the feces was on his ankles, and at this stage we have to cast all facts in his favor and assume them as true. But he doesn't say it would have been visible. In other words, what I'm trying to get at is Mr. Hamlet clearly told Officer Hoxie that there were feces in the shower and that it had made contact, but once he's taken out of the shower and back to his cell, is there any evidence that Officer Hoxie would have seen or would have known that there were still feces in contact with his ankles? Your Honor, the record is unclear here, but we contend that a reasonable juror could presume that Officer Hoxie would be aware of that continual contact with the feces just because the feces would remain until he was able to clean himself, seeing as though Officer Hoxie further deprived him of linens and further deprived him of showers, a means of essentially remediating that exposure. Let's assume that the only contact was during the 30 or 40 minutes that he was locked in the shower. Would you explain how that rises to the level of an Eighth Amendment violation based on the authority? Your Honor, I would answer your question, but we also would like to just ground the court on the fact that the exposure continues. But looking just at the 30, 40 minutes, Mr. Hamlet has diabetes, he has open wounds, he's in a tiny shower that is flooded with urine and feces. As the feces decomposes in that flooded water, the entire water becomes contaminated. And so for 40 minutes, effectively, his open wounds are being soaked in feces and bacteria that causes infection. And looking at this case, the risk of harm actually manifested. He developed endocarditis, requiring a heart valve surgery to save his life. And looking at those facts alone, a reasonable juror can conclude that there was an objective risk. And thinking about the subjective component of the Eighth Amendment analysis, a reasonable juror could also conclude that Officer Hoxie was aware of the risk of harm to feces because this court has made clear that placing someone in close contact with feces poses an objective risk of harm. Two questions. Does the record show, one, it's obvious that he did have the heart condition. Does the record show any agreement that that heart condition would be caused by something like this? Your Honor, I think your question is going to whether the feces cause the heart condition. Your Honor, we'd like to state that that is a matter of causation that wasn't actually engaged in. There's no evidence in one way or the other? There's the evidence in his medical record at ECF 142 that he developed the endocarditis that was from a bacterial infection. And a reasonable juror can conclude that that bacterial infection was the product of the direct exposure to feces and the bacteria that was soaked in his ankles. My second question was, let's say, not for your client, right, but let's say that for a different case, a similar scenario happened, but the guard was clearly convinced that the feces were those of the prisoner himself. Does that change the analysis? Do we have cases saying that that, too, would qualify? Your Honor, that would not change the analysis because if you look at Brooks, if you look at Bilal, that was the instance of where the feces was the incarcerated individual's own feces. But nevertheless, the court stated that that contact enough was sufficient. And we'd also like to highlight that that difference is very material here. And the fact that the feces was not his own, unlike Brooks and Bilal, the feces was that of someone else. We don't know what types of bacteria this other person could have had. Here's one problem I have. It doesn't seem to me that the officer would have—there's nothing here to suggest he knew before the prisoner called out, right, or that he was ever aware of the open wounds. Your Honor, we would disagree about his awareness of the open wounds because Mr. Hamlet testified that when he was walked into the shower that he had open red wounds. But you have to—where's the evidence that the officer knew about it? Your Honor, we contend that based off his testimony and his deposition at ECF 121 at 40, he stated that he had open, bright red wounds on his ankles as he was being walked to the shower in nothing but his underwear. We contend that a reasonable juror could conclude— That it was obvious. Yes, Your Honor. What about the fact that on his April 29th visit for hypoglycemia, nothing in his medical records from that visit indicates that he had wounds or feces on his body at that time? Your Honor, as you mentioned, he went to—that April 29th visit was for hypoglycemia. It was for his blood sugar. He was having a diabetic episode. The nurses had no reason to inspect his body because it was for that specific event. And so, thinking about the subjective component of the Eighth Amendment analysis, I mean, this court is clear that whether defendant poses subjective knowledge of a risk of harm is a question of fact. That a fact finder can conclude that the defendant knew because the risk was obvious. And we contend, as this court has—and other courts have contended that, for example, in Despain, that exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in Farmer and the more general standards of dignity embodied in the Eighth Amendment. That this exposure was an obvious risk. That a reasonable juror can conclude that Officer Hoxie knew of this risk and disregarded it when he pushed Mr. Hamlet back in the shower. He disregarded it further when he ransacked his cell and further when he deprived him of showering for days. And this is unlike Brooks, where there was no—the risk, no harm manifested. In Brooks, the incarcerated individual received nominal damages because there was no harm. Here, there was harm. He had a heart surgery that was the product of this harm, which makes this a more egregious case. Isn't sitting in your own feces for days or for 300 miles, doesn't that seem objectively worse than being in a shower with some small amount of feces? Your Honor, we— Neither is at all acceptable. Don't get me wrong. But doesn't—we've really required a very high standard to reach the Eighth Amendment. Your Honor, we contend that a reasonable juror can conclude that Mr. Hamlet's conditions satisfied the Eighth Amendment analysis just because of the—the feces wasn't small. When you think about two and a half ounces of feces in a small shower that decomposed throughout the shower, meaning the microscopic bacteria was throughout, and that is much different than, you know, as well here, he has open wounds and diabetes and other issues that make it—the risk of harm just much more acute. We would briefly, with the reigning time, just also ask this Court to provide him leave to reamend his First Amendment and Fourteenth Amendment claims. We say the reigning time for rebuttal. Okay. Ms. Youngi? Good morning, Your Honors. Good morning. Thank you, Mr. Court. Your Honors, correctly have identified the main problem with this case is that it's impossible to get past the objective standard as to the extremity of the exposure to human waste. Judge Milderbrooks, with many decades of experience, very carefully reviewed this record, did not even draw any concerns about what were the implausible inferences, which he would have been allowed to do, but rather took Plaintiff's version as true and found that a 2.5-ounce empty bag of potato chips that had allegedly been filled with feces and urine and had, according to Plaintiff's own words at his deposition, flipped over while he was showering with continuing running water, had then been so extreme that it led to all of the Eighth Amendment violations. As Your Honors correctly pointed out, there is another flaw here in the subjective prong. There is absolutely no evidence that takes Officer Hoxie's response beyond what would be reasonable and certainly not beyond what would be considered just simply negligence. Mr. Hamlet himself testified at the deposition that while he was waiting to be removed from the shower by Officer Hoxie, Officer Hoxie was conducting a search of his cell. Mr. Hamlet described it as a toss and throwing out all of Mr. Hamlet's items, but it's clear that Officer Hoxie was not standing along, as other officers in other cases have been, ridiculing an inmate, for example, who was sitting in his own feces, which is horrifying, but rather was conducting what he was supposed to do in the disciplinary confinement ward, which is to make sure that this environment he was going to return that inmate to was safe. In their brief... You're basing your argument about the objective prong on the quantity of the feces, but the theory here, of course, is that the water distributed the feces around, so essentially he was standing in a pool of feces. Where is there any authority where we've talked about the amount of feces to which the inmate is exposed or that that would matter? Indeed, Your Honor, there is no authority, as Abel Counsel pointed out in their brief, setting a minimum threshold, perhaps because this is what I might borrow from Judge Marcus in the Brooks v. Warden case, the rare case of obvious clarity, the opposite direction. When have you had a chance before you to know that there was only a certain number of ounces of human waste at issue? The cases are never like that. They're about the cases that get close to or are considered to meet the minimum violation, feces and urine and ejaculate all over cell walls, stopped up into water faucets. Inmates are forced to sleep in raw sewage. This is not like that. You have an undisputed fact record that this was at most what would fit into a 2.5-ounce-sized bag of potato chips. Plaintiff and... So what's the authority that supports your argument? So, Your Honor, certainly the Brooks v. Warden standard, we're nowhere near that. But it doesn't say anything about the quantity of feces, does it? No, Your Honor, but there are cases that talk about the extent of the exposure in a time context. So there's never been a case where there's been something as short as 30 to 40 minutes. Now, amicus and appellant would like you to say that because he was known to be a diabetic, which the record does not reflect that Officer Hoxie knew that at any time prior to this incident. Any exposure, no matter how short, no matter the quantity, was already a constitutional violation. That cannot be the case. So, Your Honor, it's much more like the situation of Saunders where the court observed and dictated that if the cell had been cleaned of the overflowing sewage every three to four days, it probably would have been... Excuse me, every three to four hours, that would probably have been... Might have been days, I apologize. That would have been within the constitutional parameters. So I don't have anything to point to a minimum threshold of human waste because there just hasn't been a case that is something like this. Indeed, that would argue... It's more about the time and the particular danger to him than the exact amount, right? Correct, Your Honor, and you could analyze it. So what was the focus of plaintiff's efforts below was being placed in the cell and then the 30 to 40 minutes he was left in there after Officer Hoxie was called over. Plaintiff admitted as a deposition that nobody could see the potato chip bag when he was placed in the cell. So there's no indication that there was anything that Officer Hoxie did wrong in placing the inmate in the cell, in the shower stall. The shower stall was four to eight feet. Mr. Hamlet testified as deposition. He not only did move, as Your Honor correctly noted, to a higher part of the shower floor where he could avoid having the water touch his ankles. He admitted he had running water. Is that in the record that he could be in a place where the water would not reach his ankles? He specifically said that's why he moved to that area. He also admitted that he had been sitting on the four-foot-high concrete wall or a bench that was in the shower and he could have done that as well. He also admitted that water was running the entire time and he had a towel. And he admitted that after he was back in his cell, he used his toilet bowl to put his feet in to wash himself. That's not a great way to wash your feet. It's not a great way, but it certainly defeats his argument that he had no ability to do anything, particularly when, as Your Honors have recognized, he was in the infirmary four days later for a 23-hour period of observation. Those individuals who treated him during that period of observation, trained medical professionals, did know he was diabetic. And it would be fair to understand that their record, which revealed that he reported no acute distress, was not just a monitoring of hypoglycemia, as the appellant has suggested here, but rather would have certainly noted if he had gaping wounds that were infected. So the record before Judge Millibrooks was... I disagree that he testified he had open wounds and that he was led only in his underwear into the shower. Absolutely, Your Honor. We have to infer from that that it was obvious to the officer. I disagree that you have to infer that it was obvious because he, at his deposition, said that the feces, quote, covered his wounds, end quote. There was no indication in the record before Judge Millibrooks ruled on summary judgment that Officer Hoxie either knew of the diabetes or knew of the open wounds. Well, he had the open wounds presumably on the way into the shower, and so Officer Hoxie could have observed them then. It's true, but the record reflects that Mr. Hamlet is a very tall man, a large man. He admitted that these were down around his ankles. He doesn't even make the allegation in his complaint or in his grievance filed immediately after the event that there was anything about wounds or infection or feces on his feet. Well, let's suppose the open wounds were visible. Correct. Is it reasonable for an officer to expect someone with open wounds to stand in contaminated water for any period of time? Your Honor, it would not be reasonable if there was a security interest that allowed them to be immediately removed from it, and here the evidence in the record before Judge Millibrooks was that Officer Hoxie's response was reasonable in the circumstances, and the precedent allows an officer to have a reasonable response and not be found to have violated the Constitution even if it doesn't avert the danger, and that would be the situation here. Is a 40-minute shower typical? I mean, that sounds pretty luxurious, honestly. Your Honor, I want to be careful not to go outside the record, but what was before the court is that it takes about 30 to 45 minutes for them to toss each cell. Remember, this is the disciplinary confinement unit. Showers are only done on Monday, Wednesday, and Friday nights, so that is when the cells are searched. Otherwise, the inmates, and I believe I'm staying within the record here, are in their cells, so that's the one time to do searches for contraband, etc. So they keep them in the shower until their cell is cleared for safety reasons. Precisely, and also it's a chance, frankly, for the inmates to have a little bit of time out of their cell. And Mr. Hamlet said he enjoys going to the shower. Would Your Honors like me to address the First and Fourteenth Amendment issues? I'll be happy to cede the rest of my time. Thank you, Your Honors. Thank you. Mr. Rajalu, excuse me. Your Honor, I'd like to just highlight some of opposing counsel's comments, which are, in fact, accurate. There has never been a case like this. But I think it's important to understand why would someone intentionally expose themselves when they know they're diabetic, and they know they have open wounds on their ankles, why would they intentionally place themselves in a situation where they could be further exposed? And I would like to provide Mr. Hamlet's own words from his deposition. The feces, the urine, the bag is right there bumping against his legs. These are facts that the district court themselves found in their statement of facts. He further stated that he was unable to avoid, this is an ECF-130, ECF-130 from the district court's order looking at ECF-130-2. He stated that he was unable to avoid getting the urine and feces off of his ankles, that he was unable to rinse the human waste off his ankles. And opposing counsel stated that when he went back into his cell, he used toilet water. He stated that he went into his cell and he used toilet water in his bare hands to try and remove the feces from his ankles. If he had any other means of remediating this situation, why would he result to toilet water in his bare hands? The facts that we have here we must take in his favor, and a reasonable juror could determine that. The facts, as Mr. Hamlet has testified in his deposition, that they are true, and find that there was an objective risk of harm here, which in fact materialized. And looking further again to the subjective component. Well, tell me this. What is it that you contend the officer should have done that he didn't do that triggers the Eighth Amendment violation? Is it just leaving him in the shower longer than he should have? Or is it, you know, you talk about using the toilet water. I didn't understand this to be a case where he had asked the officer when he got back to the cell, can I use some other kind of water or something like that. So I want to make sure we're focused on what it is that you think the officer should have done that he didn't do or that he did that he shouldn't have done. Yes, Your Honor. The Eighth Amendment just requires the officer not to place the incarcerated individual in continual contact and exposure to feces. He goes into a shower. He's not exposed to feces at the beginning. The officer has no reason to believe that he will be. That record's pretty clear about that. He goes back to search his cell. And then the inmate calls out, right? He calls out to the officer, right, after the exposure, right? The exposure occurs. He calls out to the officer. All right, now we're in the operative period. What exactly do you think the officer was required to do and how does it trigger the Eighth Amendment? Yes, Your Honor. When Mr. Hammack called out to Officer Hoxie to be let out because of urine and feces, he shouldn't have pushed him back into the shower. He shouldn't have done that. What he should have done, he could have placed him in another shower, a clean shower, if he actually needed to go to his cell and do whatever he needed. The operative issue is placing that individual in continual contact with that feces, particularly looking at here, as that contact lasted until he was able to actually clean himself. Does the record reflect that your client was able to get his ankles out of the water? Your Honor, it's not clear, but we also want to clarify that Mr. Hamlet has mobile impairments. That is why he was sitting down and showering. So if he had to raise his legs for 40 minutes, even for a physically fit person, that would prove difficult. Could he put his feet on the bench, too? Your Honor, the issue here is that it's such a small shower, even if he was on the bench, he would have to eventually step back into the shower to leave and exit, further exposing himself to the feces. That may be true, but some minimal exposure, given the conditions, might have just been, given your client's mobility issues and everything else, I'm not sure that that wouldn't have been absolutely inevitable, unavoidable. And the question is, when does it rise to the level that it's just a completely objectively unreasonable risk of danger to your client, that it triggers the Eighth Amendment, right? Yes, Your Honor. In a different case, minimal exposure, absolutely in a different set of facts. That's the really question. Was it really all things considered minimal? No, Your Honor. We contend that a reasonable juror, based on the posture of this case, would not conclude that it was minimal, particularly seeing as the harm actually materialized in this case. Okay. Thank you. I think we understand your case, and we're going to move to the next one. Thank you, Your Honor.